IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | 4:05-CR-00227-1 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| DANIEL LYNN BROWN, JR., | * | ORDER |
| | * | |
| Defendant. | * | |
| | * | |

Before the Court is Defendant Daniel Lynn Brown, Jr.'s pro se Motion for

Reconsideration of his Motion for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i),

filed on March 19, 2020.[1]  ECF No. 228.  After filing, Defendant obtained counsel, who filed a

Supplemental Brief in Support of Motion for Compassionate Release.  ECF No. 235.  The

Government filed its resistance on April 27, 2020.  ECF No. 244.  The matter is fully submitted.

## I.  BACKGROUND

This case is about making up for past mistakes.

In 2006, Defendant pleaded guilty to one count of conspiracy to distribute

methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846; one count of

methamphetamine possession with intent to distribute, in violation of 18 U.S.C. § 2 and

21 U.S.C. § 841(a)(1) and (b)(1)(B); and two counts of possessing a firearm in furtherance of a

drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).  ECF No. 75.  The Court

sentenced Defendant to 150 months for the two drug counts and 60 months for the first firearms

count to run consecutive to the drug counts.  ECF No. 118.  It also added an additional

---

[1] "[P]ro se litigants are held to a lesser pleading standard than other parties," and courts are to construe their filings liberally.  *United States v. Bates*, 561 F.3d 754, 758 n.3 (8th Cir. 2009) (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008)).

mandatory 300 months for the second § 924(c) count under the then-usual practice of "stacking." *Id.* The sentencing judge, former Chief District Judge Ronald E. Longstaff, believed this was "far greater than was necessary to achieve the ends of justice." ECF No. 220 at 21. He even backed a commutation. *Id.*

Jeffrey Bowman, Defendant's codefendant, was sentenced to 170 months imprisonment and was released two years ago. ECF No. 217. Bowman mostly has done well with freedom. *See* ECF No. 233 at 3. Defendant meanwhile has been in custody since October 21, 2005. ECF No. 3.

Defendant has not had a single disciplinary incident in federal custody. ECF No. 220 at 30 (reprinting Jan. 20, 2019, Summary Reentry Plan Progress Report). According to the Federal Bureau of Prisons (BOP), "[h]e has exhibited an exemplary rehabilitative record as a testament to his positive character and efforts." *Id.* He has taken more than 6000 hours of programming, including 4150 hours in a management apprenticeship program. *Id.* "He should be employable upon release," the BOP says. *Id.* at 31. He teaches and mentors other inmates. *Id.* The BOP thinks he is quite good at it, too:

> Daniel Brown has exhibited exceptional skill in supporting his peers; he is a positive influence and utilizes his skills and education to assist with inmate literacy. He is also very influential in his religious community . . . . Daniel Brown displays excellent character, determination, and readiness to be a productive and responsible citizen in his community.

*Id.*

Adopting a positive attitude in federal prison is hard. It must have been more so after surgery on Defendant's fractured leg led to severe complications. *Brown v. United States*, 737 F. App'x 777, 781 (7th Cir. 2018) (acknowledging Defendant's injury but holding there was no evidence prison medical staff breached a duty of care). He then "fell victim to a gruesome

syndrome and endured intolerable pain for years as his seemingly avoidable condition progressed into permanent nerve damage." *Id.*

Defendant unsuccessfully tried numerous vehicles to reduce his sentence. *E.g.*, ECF Nos. 203, 205, 207, 211. Most recently, in 2019, he sought compassionate release under the newly enacted 18 U.S.C. § 3582(c)(1)(A), part of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. *See United States v. Brown*, 411 F. Supp. 3d 446 (S.D. Iowa 2019). He cited his remarkable rehabilitation and his draconian sentence that modern statute would prohibit if given today.[2] The Court determined in October that although it had the power to release Defendant, it declined to exercise it "at th[at] juncture." *Id.* at 454.

Since the Court denied his motion, he has written often. His letters have been unfailingly positive. To pick one example: "These [fifteen] years of incarceration have been a blessing to me. Through every hardship and adversity I have grown stronger and have been transformed into the man I am today." ECF No. 228 at 2. Suffice to say such language is not common in letters to the Court. Through an attorney, Defendant also pursued clemency, apparently to no avail. All the while he has gotten closer to the date that he would have been released had the law been in 2007 as it is now. In normal times, that would be the end of this matter—another sad case where the law's only answer to some terrible choices is life in a cage. But normal times these are not.

The worst medical disaster in any of our lifetimes has consumed the United States. In less-than two months, the virus known as COVID-19 has killed more than 58,000 Americans,[3] a

---

[2] The First Step Act clarified that § 924(c) counts can only be stacked if the second offense occurs after a final conviction on the first offense. § 403(a), 132 Stat. at 5221–22.

[3] *Mortality Analysis*, Johns Hopkins U. & Med. (April 28, 2020, 11:52 PM), https://coronavirus.jhu.edu/data/mortality.

number that may soon double.[4]  Society as any of us knew it has become a foggy memory.  We

have shut down courts, schools, churches, theaters, "non-essential" businesses, and Major

League Baseball—places where there are too many people and too little space to keep the virus

from spreading through air and surfaces.

   That also sounds a lot like federal prison.  Already "tinderboxes for infectious disease,"

prisons now are even more dangerous than we typically accept.  *United States v. Rodriguez*, No.

2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020).  At least 1313 prisoners

and 335 BOP staff tested positive for the virus.  *COVID-19 Cases*, Fed. Bureau Prisons (April

28, 2020, 3:00 PM), https://www.bop.gov/coronavirus/.  Twenty-eight of those inmates have

died.  *Id.*  Defendant's facility, FCI Williamsburg, is yet to confirm a case.  *Id.*

   But these numbers almost certainly do not provide the whole picture.  Testing appears to

remain limited.  *See BOP Expands COVID-19 Testing: Rapid Testing Available at Select

Facilities*, Fed. Bureau Prisons (April 24, 2020, 1:00 PM),

https://www.bop.gov/resources/news/20200424_expanded_testing.jsp.  Nor is it clear what the

future holds as states, including South Carolina, FCI Williamsburg's host, relax restrictions on

gathering for free residents, including BOP employees.  Rick Rojas & Michael Cooper, *Georgia,

Tennessee and South Carolina Say Businesses Can Reopen Soon*, N.Y. Times (April 20, 2020),

https://www.nytimes.com/2020/04/20/us/coronavirus-us-hot-spots-reopening.html.

   Meanwhile, the BOP has undertaken emergency measures to halt the virus's spread.

*BOP Implementing Modified Operations*, Fed. Bureau Prisons,

https://www.bop.gov/coronavirus/covid19_status.jsp (last visited April 28, 2020).  Social visits

---

[4] *COVID-19 Estimation Updates*, Inst. for Health Metrics & Evaluation, U. Wash. (April 27, 2020), http://www.healthdata.org/covid/updates ("Based on the latest available data, the COVID-19 epidemic's first wave could cause 74,073 cumulative deaths (estimate range 56,563 to 130,666) in the [United States].").

are cancelled, prisoner movement is limited, and legal visits are suspended. *Id.* The Attorney

General has directed BOP to consider increased use of home confinement for at-risk inmates.

Memorandum from U.S. Att'y Gen. William Barr to Dir. of Bureau of Prisons (Mar. 26, 2020).

Defendant's medical records state he is "doing well clinically" for someone in federal

prison after a botched leg surgery. ECF No. 239 at 6. They also show a history of several

conditions that doctors have linked to COVID-19 complications. Defendant registers a low

white blood cell count. *Id.* at 1–3. He has hypertension, or high blood pressure. *Id.* at 1, 4. His

presentence investigation report also listed a history of asthma, ECF No. 125 ¶ 123, although

recent medical records do not mention it, *see* ECF No. 245.

Defendant's counsel consulted Doctor Mark J. Davis, who works for the California

Department of Corrections and has experience fighting epidemics abroad. ECF No. 234 at 1.

Davis found the foregoing medical problems as well as Defendant's history of chronic migraines

and methamphetamine abuse concerning in light of COVID-19. *Id.* at 4.

> These are all respiratory concerns that can have devastating and life-threatening
> consequences for a person infected with [COVID-19]. The risks of death are even higher for
> someone housed in a closed population such as prison and especially high for Mr. Brown given
> his medical history and presentation. Not every inmate is at serious risk. Mr. Brown is an
> exception. He has unique medical concerns that present a heightened risk for infections and serious
> medical complications if he contracts the COVID-19 disease.

*Id.* at 4–5.

## II. ANALYSIS

The First Step Act amended numerous provisions of the U.S. Code to promote

rehabilitation of prisoners and unwind decades of mass incarceration. Cong. Research Serv.,

R45558, *The First Step Act of 2018: An Overview* 1 (2019). Congress designed the provision at

issue here, § 3582(c)(1)(A), for "Increasing the Use and Transparency of Compassionate

Release." § 603(b), 132 Stat. at 5239. Section 3582(c)(1)(A) allows defendants, for the first

time, to petition district courts directly for compassionate release. *Id.* Under the old regime, defendants could petition only the BOP Director, who could then make a motion, at his or her discretion, to the district court. *See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.4 (U.S. Sentencing Comm'n 2018) [hereinafter U.S.S.G.]. The Director rarely did so. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

### A. *Exhaustion*

The First Step Act created two ways for a defendant to bring a compassionate release motion to a district court. The defendant may file a motion once he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*."[5] § 3582(c)(1)(A) (emphasis added). With this second path, the statute's plain text states only that thirty days must past after the defendant requests compassionate release from the warden. No more, no less. *United States v. York*, No. 3:11-CR-76, 2019 WL 3241166, at *5 (E.D. Tenn. July 18, 2019). The statute's text does not place a time limit on the Defendant's ability to sue, nor does it state that the reasons presented to the warden must mirror those presented to the district court. *See id.* at *6 (noting that "[n]othing in the amended language of § 3582(c)(1)(A) indicates that a defendant is required to file a new administrative request" following the First Step Act's passage).

---

[5] "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise. . . ." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). And as in *Reiter*, "here it does not." *Id.*; *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2130 (2016) (Thomas, J., dissenting). This is so because the phrase "*whichever* is earlier" makes clear that full exhaustion and "the lapse of 30 days" constitute two distinct paths to federal court. § 3582(c)(1)(A) (emphasis added).

The Government concedes that thirty days have passed since Defendant filed a petition for compassionate release with his warden.  ECF No. 244 at 2.  But the Government contends this petition no longer suffices because Defendant filed it in 2019, before COVID-19 entered the lexicon.  *Id.* at 2–3.  Rather, the Government argues, the Defendant must first raise any reasons supporting compassionate release with his warden before presenting them here.  *Id.* at 3 (citing *United States v. Jenkins*, No. 4:15-CR-3079, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020)).

Requiring Defendant to raise arguments during administrative proceedings first would constitute an "issue exhaustion" requirement.  *See Etchu-Njang v. Gonzales*, 403 F.3d 577, 581 (8th Cir. 2005) (citing *Sims v. Apfel*, 530 U.S. 103, 107 (2000)).  But the Supreme Court has warned against "reflexively" applying issue exhaustion to judicial review of any agency decision.  *Sims*, 530 U.S. at 110.  Rather, "[t]he desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding."  *Id.* at 109.  The more an administrative proceeding looks like that of an Article III court, the more likely a litigant must first raise the issue below.  *Id.* at 110.  By contrast, barring unambiguous statutory text to the contrary,[6] issue exhaustion is inappropriate when the proceedings are more inquisitive than adversarial.  *Id.*; *see also Etchu-Njang*, 403 F.3d at 583.  Thus, the Supreme Court has held that an issue exhaustion requirement is inappropriate when reviewing Social Security proceedings, where both parties to the dispute lack representation and the decider—an administrative law judge—has the duty to investigate the facts and develop the arguments for and against relief.  *Sims*, 530 U.S. at 110–11.

---

[6] *See,* e.g., 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

Here, issue exhaustion is inappropriate because § 3582 contains no such requirement and BOP compassionate release requests are not adversarial proceedings. Indeed, there are no proceedings. Rather, a prisoner makes a request, and the warden decides whether to release the prisoner. The warden marshals the facts and weighs each side. Federal prosecutors and the prisoner do not have representatives or make arguments. The warden, as here, may not even respond to the prisoner's request. Such a process more closely resembles the inquisitive Social Security proceedings in *Sims* than the adversarial proceedings before this Court. Thus, precedent dictates it is inappropriate to require issue exhaustion. Defendant may raise new arguments, including a sudden, global pandemic, in his motion to the Court.[7]

Indeed, Defendant already satisfied the exhaustion requirement's text and purpose. He gave the BOP the first chance to review his circumstances and let thirty days pass before proceeding to court. The BOP, apparently, decided it was not worth a response. ECF No. 225 at 1. Because Defendant satisfies § 3582(c)(1)(A)'s gatekeeping provision, the Court may consider his motion's merits.

---

[7] To the extent § 3582's exhaustion requirement remains unsatisfied, it can be waived. Statutory exhaustion requirements are presumed to be "non jurisdictional," and thus waivable, "unless Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision." *Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 996–97 (8th Cir. 2006) (quoting *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir.2004)). Section 3582(c)(1)(A) makes no such statement. Rather, it explicitly allows the judiciary to hear compassionate release actions "before the agency has come to a decision" so long as thirty days have passed. *Id.*; *see also United States v. Haney*, No. 19-CR-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020), (Rakoff, J.) ("Importantly, § 3582(c)(1)(A) does not contain an exhaustion requirement in the traditional sense . . . as it allows a defendant to come to court before the agency has rendered a final decision."); *but see United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

And if the exhaustion requirement is non-jurisdictional, a court can waive it "if exhaustion would cause irreparable harm, [or] if further administrative procedures would be futile." *Ace Prop. & Cas. Ins. Co.*, 440 F.3d at 1000. Both exceptions apply here. BOP review would be futile because the warden, as far as the Court knows, still has not replied to Defendant's 2019 request for compassionate release. Furthermore, Defendant faces irreparable harm as COVID-19 continues to spread throughout federal prisons. *United States v. Perez*, No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020) (citing *Washington v. Barr*, 925 F.3d 109, 118–19 (2d Cir. 2019)).

B.  *Extraordinary and Compelling Reasons*

Compassionate release provides a path for defendants with "extraordinary and compelling reasons" to leave prison early.  § 3582(c)(1)(A)(i).  Such a sentence reduction must comply with the 18 U.S.C. § 3553(a) factors and "applicable policy statements issued by the Sentencing Commission."  § 3582(c)(1)(A).

1.  Definitions

Congress never defined what constitutes "extraordinary and compelling."  28 U.S.C. § 994(t).  Instead, the statute directed the Commission to promulgate "the criteria to be applied and a list of specific" extraordinary and compelling examples.  *Id.*  Before the First Step Act, the Commission had provided just three such examples, none of which apply here.[8]

The Commission also provided a catch-all provision that allows the BOP Director to determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  § 1B1.13 cmt. n.1(D).  That still begs the question: what is extraordinary and compelling?

Congress and the Commission gave two guideposts.  Extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing."  § 1B1.13 cmt. n.2.  For example, just because a judge believes a defendant will dramatically improve himself while

---

[8] First, the defendant's medical condition is such that he suffers from a "terminal illness" or the condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  § 1B1.13 cmt. n.1(A).

Second, "[t]he defendant (i) is at least [sixty-five] years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least [ten] years or [seventy-five] percent of his or her term of imprisonment, whichever is less."  § 1B1.13 cmt. n.1(B).

Third, the defendant's family circumstances include either "(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children" or "(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."  § 1B1.13 cmt. n.1(C).

incarcerated, that does not mean she cannot deem such improvement extraordinary and compelling.  And although "rehabilitation . . . is not, *by itself*, an extraordinary and compelling reason," its mention by the Commission and Congress indicate rehabilitation may be considered with other factors.  *See* § 1B1.13 cmt. n.3 (emphasis added); *see also* § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

Courts otherwise are left to themselves because the Commission, for whatever reason, never updated its policy statement, as statutorily required, for the First Step Act.[9]  Rather, the outdated policy statement still assumes compassionate release "may be granted only upon motion by the Director of the Bureau of Prisons."  § 1B1.13 cmt. n.4.  This left district courts in a conundrum.  On the one hand, Congress unequivocally said it wishes to "[i]ncreas[e] the [u]se . . . of [c]ompassionate [r]elease" by allowing district courts to grant petitions "consistent with *applicable* policy statements" from the Commission.  § 3582(c)(1)(A) (emphasis added).  On the other hand, the Commission—unable to take any official action—has not made the policy statement for the old regime applicable to the new one.

Many courts, including this one, have concluded this means the Commission lacks an applicable policy statement regarding when a court can grant compassionate release.  *United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *14 (E.D.N.Y. Apr. 22, 2020) (citing thirteen such cases); *Brown*, 411 F. Supp. 3d at 450.  In the absence of an applicable policy statement, these courts conclude "the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant

---

[9] The Commission cannot amend its guidelines until it again has four voting commissioners. *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *1 n.1 (S.D. Tex. June 17, 2019) (quoting *United States v. Handerhan*, No. 1:10-CR-00298, 2019 WL 1437903, at *1 n.4 (M.D. Pa. Apr. 1, 2019)).  The Commission still has only two voting members.  *About the Commissioners*, U.S. Sentencing Comm'n, https://www.ussc.gov/commissioners (last visited April 23, 2020).

granting relief." *Cantu*, 2019 WL 2498923, at *5; *see also United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) (treating "the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts").  The result is that the district court can consider anything—or at least anything the BOP could have considered—when assessing a defendant's motion.  The number of courts adopting this position has grown since the Court issued its previous Order, and particularly as Courts have begun to grapple with the profound penological consequences of COVID-19.  *E.g.*, *Rodriguez*, 2020 WL 1627331, at *12.

To be sure, some courts still maintain that the First Step Act merely allows them to grant a motion for compassionate release if the BOP Director could have done the same under the Sentencing Guidelines *and* the BOP Program Statement written for the old law.  These courts conclude judges may not stray beyond the specific instances listed in § 1B1.13 cmt. n.1 (A)–(C).  *E.g.*, *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019).  They reason that the Sentencing Commission reserved § 1B1.13 cmt. n.1's residual provision for the BOP Director and only the BOP director.  *Id.*  The Government in this case takes that position, too.

Courts assume Congress legislates with the full knowledge of how agencies have interpreted earlier versions of a statute.  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (noting Congress has "effectively ratified the FDA's long-held position").  Congress also can "revoke or amend" the Sentencing Commission's guidelines and policy statements at any time.  *United States v. Anderson*, 686 F.3d 585, 590 (8th Cir. 2012) (citing *Mistretta v. United States*, 488 U.S. 361, 393–94 (1989)).  The U.S. Supreme Court repeatedly has noted that "'the title of a statute and the heading of a section' are 'tools available

for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947)).  Although titles are not dispositive, sometimes they can be "especially valuable." *Yates v. United States*, 135 S. Ct. 1074, 1090 (2015) (Alito, J., concurring).

Here, Congress knew of the BOP's rare granting of compassionate release petitions.[10] Until 2013, on average, "only [twenty-four] inmates were released each year." *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).  That number increased to eighty-three inmates between August 2013 and September 2014 following complaints to the BOP from the Inspector General's office.  *Id.*  Since Congress still amended the program following this increase, one can infer Congress thought eighty-three was still insufficient.  Because rather than "effectively ratif[ying]" the BOP's position, Congress sought to overturn it by statute.  *Brown & Williamson Tobacco Corp.*, 529 U.S. at 144.

The Act listed these changes under the title of "Increasing the Use and Transparency of Compassionate Release."  § 603(b), 132 Stat. at 5239.  That title is "especially valuable" here. *Yates*, 135 S. Ct. at 1090.  The Court assumes the BOP Director faithfully executes the narrowly drawn policy and program statements related to compassionate release.  Therefore, the only way direct motions to district courts would increase the use of compassionate release is to allow district judges to consider the vast variety of reasons that may be "extraordinary and compelling."

---

[10] The First Step Act's compassionate release provisions originally appeared as a stand-alone bill. Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018).  That bill explicitly sought to "improve the compassionate release process of the Bureau of Prisons."  *Id.*

The Court acknowledges the policy arguments to the contrary.  Yes, releasing defendants from incarceration is a delicate business—but not any more so than incarcerating them initially. The Court's reading also does not—and, indeed, has not—allowed judges to release any prisoner through compassionate release.  The Court recognizes and respects the intricate sentence-adjustment scheme Congress has created.  The Court also knows it must still act in harmony with any sentencing policy guidelines that remain applicable and the § 3553(a) factors. § 3582(c)(1)(A).  For instance, the need to appropriately punish severe conduct and not introduce sentencing disparities between defendants convicted of similar crimes provide additional limits on a judge's ability to release people from custody.  *See* § 3553(a)(2)–(6).

Therefore, if the First Step Act is to increase the use of compassionate release, the most natural reading of § 3582(c) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it.  Unqualified "deference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role."  *Fox*, 2019 WL 3046086, at *3.

## 2. Defendant's Extraordinary and Compelling Reasons

More and more courts have found that exceptional rehabilitation; large sentencing disparities; and COVID-19's unprecedented dangers all constitute extraordinary and compelling reasons to grant compassionate release.  When the Court denied Defendant's previous Motion, it noted much about his circumstances was "extraordinary and compelling."  *Brown*, 411 F. Supp. 3d at 452–54.  However, the Court suggested something more was needed.  *See id.* at 453–54.  A global pandemic that endangers all prisoners—and especially Defendant—suffices.

a.   Rehabilitation

"Rehabilitation of the defendant *alone* shall not be considered" sufficiently extraordinary and compelling to justify compassionate release.  § 994(t) (emphasis added).  For the word "alone" to do any work—as it must—that means courts can consider rehabilitation as *part* of a compassionate release motion.  *Cf. Corley v. United States*, 556 U.S. 303, 314 (2009) (stating that a "statute should be construed so that effect is given to all its provisions" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004))).  Several courts have concluded the same and considered a defendant's rehabilitation in granting compassionate release.  *E.g.*, *United States v. Marks*, No. 03-CR-6033L, 2020 WL 1908911, at *7 (W.D.N.Y. Apr. 20, 2020) (collecting cases).

To say Defendant has been a model inmate is an understatement.  To pick just a few of the BOP's compliments:

- "He has exhibited an exemplary rehabilitative record as a testament to his positive character and efforts."  ECF No. 220 at 30.

- "He should be employable upon release."  *Id.* at 31.

- "Daniel Brown displays excellent character, determination, and readiness to be a productive and responsible citizen in his community."  *Id.*

He also has not had a single disciplinary incident.  *Id.* at 30.  The Court does not see BOP Progress Reports like this often.  It is more remarkable, still, considering the hardships Defendant has endured in custody, including a leg surgery that caused avoidable yet "intolerable pain for years . . . [that] progressed into permanent nerve damage."  *Brown*, 737 F. App'x at 781.  Thus, Defendant's rehabilitation cuts in favor of release.

b.   § 924(c) Counts

Since the Court's original order, several courts have granted § 3582(c) motions, in part, because of the massive sentencing disparities caused by changes to § 924(c).  *Marks*, 2020 WL

1908911, at *16 (holding rehabilitation and changes to § 924(c) stacking constitute extraordinary and compelling circumstances); *United States v. McPherson*, No. CR94-5708RJB, 2020 WL 1862596, at *5 (W.D. Wash. Apr. 14, 2020) ("It is extraordinary that a civilized society can allow this to happen to someone who, by all accounts, has long since learned his lesson."); *United States v. Wade*, No. 2:99-CR-00257-CAS-3, 2020 WL 1864906, at *4 (C.D. Cal. Apr. 13, 2020) (same); *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020) (considering § 924(c) stacking changes one of several extraordinary and compelling reasons).  In some cases, the government appears to have accepted these decisions. *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *4 (D. Neb. Nov. 14, 2019) ("A reduction in his sentence is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed."), *appeal dismissed following government request*, No. 20-1603 (8th Cir. April 1, 2020).

Sentences given to many like Defendant "would be laughable if only there weren't real people on the receiving end of them."  *United States v. Holloway*, 68 F. Supp. 3d 310, 312 (E.D.N.Y. 2014).  Defendant received a 510-month sentence—or 42.5 years—after pleading guilty to selling an admittedly large amount of methamphetamine in western Iowa during the early 2000s.  ECF No. 125 ¶¶ 10–62.  His codefendant, who ran his own drug operation, was released two years ago.  ECF No. 217.

Defendant, by contrast, remains in federal prison because he pleaded guilty to two counts of firearm possession in furtherance of a drug trafficking crime, a violation of § 924(c)(1)(A).  At the time of sentencing, like now, one § 924(c) count carried a five-year minimum sentence that

must be served consecutively.[11]  An additional § 924(c) count required the district court to tack

on another twenty-five years in prison, even though that gun possession occurred during the

same course of conduct as the original count.  *Compare* § 924(c)(1)(C), *with Deal v. United*

*States*, 508 U.S. 129, 136–37 (1993), *superseded by statute* § 403(a), 132 Stat. at 5221–22, *as*

*recognized in United States v. Davis*, 139 S. Ct. 2319 (2019).  Even the judge who sentenced

Defendant concluded the additional 300 months' imprisonment from the second § 924(c) count

was "far greater than was necessary to achieve the ends of justice."  ECF No. 220 at 21.

Congress, to an extent, agreed.  The FSA clarified that § 924(c) counts can only be

stacked if the second offense occurs *after* a final conviction on the first offense.  § 403(a), 132

Stat. at 5221–22.  In other words, if sentenced today, a court may have added only five—and at

most ten—years to Defendant's sentence for carrying a gun while selling drugs, not thirty.[12]

Congress did not make this change retroactive.  § 403(b), 132 Stat. at 5222.

The Court is sensitive to the fact that retroactivity for sentencing calculations generally is

the Legislature's province.  But Congress already has shown how factors that are not sufficient to

establish an "extraordinary and compelling reason" alone can still be considered with other

factors.  *See* § 994(t).  Thus, although the Court cannot make § 403 of the First Step Act

retroactive, it can still consider the resulting sentencing disparity as part of a motion for

compassionate release.  And if this is so, it is hard to argue that the manifest unfairness of

---

[11] Congress increased the mandatory minimum to seven years if the gun was "brandished," § 924(c)(1)(A)(ii), and ten years if "discharged," § 924(c)(1)(A)(iii).

[12] The Government argues that Defendant would have faced an extra ten years, rather than five years, in prison because Defendant pleaded guilty to both a violation of § 924(c)(1)(A)(i) (providing a five-year mandatory minimum for gun possession) and § 924(c)(1)(A)(iii) (providing a ten-year mandatory minimum if the firearm is discharged).  ECF No. 224 at 13; *see also* ECF No. 118 at 1–2 (describing Defendant's sentence).  But this assumes that had the Government been limited to a single § 924(c) count in 2006, it would only have persuaded Defendant to plead guilty to a violation of § 924(c)(1)(A)(iii).  The Court declines to indulge the hypothetical.

keeping a man in prison for decades more than if he had committed the same crime today is

neither extraordinary nor compelling.  As numerous courts have held, this, too, cuts in favor of a

sentence reduction under § 3582(c).[13]

c.  COVID-19

Meanwhile, the number of courts that have granted compassionate release because of

COVID-19 grows by the day.  *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *9

(W.D.N.Y. Apr. 22, 2020); *United States v. Hernandez*, No. 18 CR. 834-04 (PAE), 2020 WL

1684062, at *3 (S.D.N.Y. Apr. 2, 2020); *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL

1849748, at *4 (S.D.N.Y. Apr. 13, 2020); *Rodriguez*, 2020 WL 1627331, at *1; *United States v.

Jepsen*, No. 3:19-CV-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020); *Perez*,

2020 WL 1546422, at *4; *United States v. Campagna*, No. 16 CR. 78-01 (LGS), 2020 WL

1489829, at *1 (S.D.N.Y. Mar. 27, 2020).

COVID-19 appears to pose a particular risk for individuals with certain existing health

conditions.  These include a compromised immune system, heart disease, and asthma.  *Groups at

Higher Risk for Severe Illness*, Ctrs. for Disease Control & Prevention (April 17, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

Indeed, several courts have cited a weakened immune system or low white blood cell

count as a basis for granting compassionate release.  *Campagna*, 2020 WL 1489829, at *1

(noting the fifty-five-year-old defendant "suffers from a compromised immune system with very

low white blood cell counts . . . put[ting] him at significant risk if he were to become infected

---

[13] It perhaps is worth noting the BOP currently calculates Defendant's release date, based in part on good conduct time credits, as January 7, 2042—less than twenty-five years from now.  *Find an Inmate*, Fed. Bureau Prisons, https://www.bop.gov/inmateloc/ (last visited April 28, 2020).

with the current Coronavirus"); *Jepsen*, 2020 WL 1640232, at *3.  So too with asthma, *Smith*, 2020 WL 1849748, at *4, and hypertension, *Rodriguez*, 2020 WL 1627331, at *7.

Here, Defendant's medical records show several of these risk factors linked to COVID-19 complications.  He has a low white blood cell count and hypertension.  ECF No. 239 at 1.  In his affidavit to the Court, Doctor Mark J. Davis also said that Defendant's history of migraines and methamphetamine use, structural nasal obstruction, and sleep apnea create further risk of respiratory infection.  ECF No. 234 at 3–4.  The Government offers no rebuttal to Defendant's medical evidence.  Rather, it only counters that Defendant's evidence is insufficient and that he never really had asthma.  ECF No. 244 at 7; *but see* ECF No. 125 ¶ 123.  Even accepting that Defendant's history of asthma is thinly supported, Defendant still has two risk factors accepted by other courts and the Centers for Disease Control and Prevention.  Thus, the particularized risks of COVID-19 cut in favor of extraordinary and compelling reasons supporting compassionate release.[14]

To be sure, Defendant does not fit in one of the three categories that once formed the heartland of compassionate release cases.  He is not terminally ill, at least not yet.  He is not older than sixty-five.  Although his daughter lacks a free parent—Defendant's wife died shortly before his incarceration—she is an adult and Defendant is not her caregiver.  *See* § 1B1.13 cmt. n.1(A)–(C).  But Congress recognized these three categories created by the Sentencing Commission were insufficient when it sought to open compassionate release to more inmates.  And regardless, even the Commission realized there would be "extraordinary and compelling" cases that fell outside the heartland.  Defendant's rehabilitation, draconian sentence, and

---

[14] It is important to note what the Court is not saying that every federal inmate with a COVID-19 risk factor necessarily meets the criteria for compassionate release.  Rather, the Court is saying that it is but one factor, like extraordinary rehabilitation, that can cut in favor of compassionate release.

particularized health risks amid a global pandemic constitute extraordinary and compelling reasons.

## C.  *§ 3553(a) Factors*

Finally, the Court must consider if compassionate release comports with any applicable § 3553(a) factors.  § 3582(c)(1)(A).  To be sure, the "nature and circumstances of the offense" are serious, if not unique in the Southern District of Iowa.  § 3553(a)(1).  Defendant pleaded guilty to selling an admittedly large amount of methamphetamine during the early 2000s.  ECF No. 125 ¶¶ 10–62.  His gun also went off during his arrest.[15]  At the same turn, as discussed above, the "characteristics of the defendant" are remarkable and cut strongly in favor of release. § 3553(a)(1).  In the past month, the Court has received ten letters supporting Defendant's release.  ECF Nos. 233, 237.  That does not happen often.

Meanwhile, the "need for the sentence imposed" appears increasingly weak. § 3553(a)(2).  Congress, by amending § 924(c), already made clear that the "seriousness of the offense" does not automatically warrant 300 additional months of imprisonment. § 3553(a)(2)(A).  And given Defendant's spotless prison disciplinary record, incarceration is unnecessary "to protect the public from further crimes of the defendant."  § 3553(a)(2)(C). Meanwhile, given Defendant's exhaustive use of prison programming, the only thing left "to provide the defendant with needed educational or vocational training" is to pursue an actual vocation.  § 3553(a)(2)(D).  His counsel represents there are job offers waiting for him upon release.  ECF No. 235 at 11.

---

[15] No officers were injured, and there appears to be a credible debate as to whether the discharge was intentional.  ECF No. 125 ¶ 60.  Regardless, the sentencing judge did not appear to view it as an aggravating factor during sentencing.

Incarceration also is not the only "kind[] of sentence available." § 3553(a)(3). Noncustodial sentences also curtail "prized liberty interests" and "the Defendant always faces the harsh consequences that await if he violates the conditions" attached to such a sentence. *United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005), *rev'd*, 446 F.3d 884 (8th Cir. 2006), *rev'd*, 552 U.S. 38 (2007). Such restrictions also promote respect for the law and do not constitute any endorsement of Defendant's conduct. *See id.*

And while it is true the Sentencing Commission's Guidelines, counseled in favor of a far longer sentence, they are but one factor. *See* § 3553(a)(4). And because the Commission never released guidelines with respect to compassionate release under the First Step Act, *see supra* note 9, § 3553(a)(5)'s "pertinent policy statement" factor is neutral.

Finally, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), also cuts in favor of release. This is so because Defendant's codefendant was released two years ago and, aside from the § 924(c) counts, engaged in similar conduct. Thus, for reasons discussed above, most of the applicable § 3553(a) factors are either neutral or favor release.

This case indeed is about making up for past mistakes. Defendant has made up for his. Now the Court must make up for its own. Congress passed the First Step Act as a down payment in unwinding decades of mass incarceration. That law's text was explicit that it sought to increase the use of compassionate release. The Court intends to follow that directive. Defendant's motion for compassionate release is granted.

### D.  *Release Plan*

Defendant's term of imprisonment is reduced to time served. His term of supervised release remains at ten years and is subject to the terms of the latest judgment. *See* ECF No. 165.

The Government requested that should the Court grant Defendant's motion, it order he be quarantined with BOP to reduce the chance that he spread COVID-19 outside of the facility. There is some irony to this request given the Government's insistence there is no exposure to COVID-19 at FCI Williamsburg.  Given the circumstances, it seems the best way to balance Defendant's safety and liberty with public health would be to *test* Defendant for the virus before his release and adapt accordingly.  *See McPherson*, 2020 WL 1862596, at *5.  Barring such certainty, the Court orders that Defendant submit to U.S. Probation and Pretrial Services Office (USPO) screening following his release.  He also shall remain in self-quarantine for fourteen days upon returning home.  He shall comply with national, state, and local orders regarding COVID-19.  And regardless of the results of any screening or the text of any ordinance, Defendant shall act with the public's health in mind as he reenters society.  In sum, stay safe.

### III.  CONCLUSION

For the reasons stated herein, Defendant's pro se Motion to Reconsider his Motion Reduce Sentence (ECF No. 228) is GRANTED.  The Court's previous Order (ECF No. 227) denying compassionate release is AMENDED, consistent with this Order.

IT IS THEREFORE ORDERED that Defendant's Motion for Compassionate Release pursuant to § 3852(c)(1)(A) is granted.  IT IS FURTHER ORDERED that upon release, the defendant shall begin serving the ten-year term of supervised release pursuant to conditions previously imposed by the Court.  He shall report to the Southern District of Iowa's USPO within sixty days of release.

IT IS SO ORDERED.

Dated this 29th day of April 2020.

ROBERT W. PRATT, Judge
U.S. DISTRICT COURT